FLOYD, J.,
concurring in part and dissenting in part:
I agree with my colleagues in the majority that none of Appellant Jorge Torrez’s complaints with respect to his trial merit *324 reversal. However, I would find that Tor-rez was ineligible for the death penalty and accordingly vacate his death sentence and remand for resentencing. Therefore, while I concur in Parts I — III of the majority opinion, as well as Part IV.A and. Part IV.C, I must dissent from the remainder of Part IV and the ultimate conclusion in PartV.
I.
The majority opinion adequately lays out the facts and the basic premises of the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-98, and they need not be repeated in depth here. I thus restate only the most relevant information. The FDPA contains sixteen enumerated aggravating factors for a defendant convicted of homicide, which generally relate to either characteristics of the defendant, the offense, or the victim. See 18 U.S.C. § 3592(c)(l)-(16). At the end of this list is a catchall, known as the “non-statutory aggravator,”.. that permits the jury to “consider whether any other aggravating factor for which notice has been given exists.” Id. § 3592(c). We concern ourselves today with two of the five statutory aggravators that deal with previous convictions for those convicted of homicide — § 3592(c)(2) and (c)(4).[1]
•The government proceeded against the Appellant Jorge Torrez in this FDPA case on the exclusive basis of those two statutory aggravating factors. Torrez was convicted and found death eligible by the jury on the basis of these two statutory aggrava-tors, and subsequently the jury recommended he be sentenced to death.
II.
Although I have concerns about the appropriateness of using post-offense conduct as “previous convictions,” I share the majority’s view that we are bound by United States v. Higgs, 353 F.3d 281 (4th Cir. 2003), with respect to this challenge. See ante at 304-30.[2] Where I part ways with my colleagues in the majority is in their belief that the holding in Higgs with respect to the categorical approach was not implicitly overruled by the Supreme Court. See ante at 313-15, 319-20.1 would find that (1) the holding regarding the categorical approach in Higgs was overruled implicitly by the Supreme Court in James v. United States, 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007);[3] (2) the categorical approach does apply to determining whether a conviction can satisfy 18 U.S.C. § 3592(c)(2) or (c)(4); and (3) *325 Torrez’s convictions for the Arlington Offenses do not satisfy either 18 U.S.C. § 3592(c)(2) or (c)(4) and thus Torrez is ineligible for the death penalty. Accordingly, I would vacate his death sentence and remand this case for resentencing,
A.
The categorical approach was first announced in Taylor v. United States, 495 U.S. 575, 599-602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)-four years before the passage of the FDPA. In Taylor, the Court considered 18 U.S.C. § 924(e), one of the penalty provisions of the Armed Career Criminal Act. (ACCA), which provides a sentence enhancement “[ijn- the case of a person who ... has three previous convictions ... for a violent felony or a serious drug offense, or both.” 18 U.S.C. § 924(e)(1). The Court in Taylor found that the language of the statute indicated that Congress wanted the focus of this sentencing enhancement to be. focused on the fact of conviction, rather than the facts underlying the convictions. 495 U.S. at 600, 110 S.Ct. 2143. As the Court explained:
Section 924(e)(1) refers to “a person who ... has three previous convictions” for — not a person who has committed— three previous violent felonies or drug offenses. Section 924(e)(2)(B)(i) defines “violent felony” as any crime punishable by imprisonment for more than a year that “has as an element” — not any crime that, in a particular case, involves — the use or threat of force.
Id. The Court went on to further find that the legislative history “show[ed] that Congress generally took a categorical approach to predicate offenses,” and that there would be “practical difficulties and potential unfairness” in applying a factual approach to determining whether previous convictions fit within the defined “violent felonies” in the ACCA. Id. at 601-02, 110 S.Ct. 2143.
In rejecting the categorical approach for 18 U.S.C. § 3592(c)(2), the court in Higgs relied on the distinction drawn in Taylor to find.that the language used in (c)(2) did not support applying the categorical approach. She Higgs, 353 F.3d at 316-17. The court explained that “ ‘[b]ecause the language [of ' (c)(2) ] quite plainly requires only that the previous conviction" “involv[e] the use or attempted or threatened use of a firearm,” it authorizes and likely requires the court to look past the elements of the offense to the offense conduct.’ ” Id. at 316 (third modification in original).
However, three and half years after our decision in Higgs, the Supreme Court issued "its opinion in James. In James, the Court expressly stated that it would apply the categorical approach of Taylor in determining whether an offense was one that “involves conduct that presents a "serious potential risk of physical injury to another.” 550 U.S. at 201-02, 127 S.Ct. 1586 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). To further clarify, the Court explained it would “consider whether the elements of the offense are of the type that would justify [the offense’s] inclusion within [18 U.S.C. § 924(e)(2)(B)(ii) ], without inquiring into the specific conduct of this particular offender.” Id. at 202, 127 S.Ct. 1586.
Subsequently, in Johnson, the statutory language that had been at issue in James was deemed unconstitutionally vague. 135 S.Ct. at 2557. In reaching this conclusion, the Court responded to the dissenting Justices’ suggestion that "the provision could be saved by simply abandoning the categorical approach. The Court stated that this was not an option, for the categorical approach was clearly applicable. The Court explained that the determination of whether the categorical approach should apply is based on the language referring to “a per *326 son who ... has three previous convictions,” and not on the language in the ACCA that defines a violent felony as “ha[ving] as an element” the use or threatened use of force. Id. at 2562 (citing Taylor, 495 U.S. at 600, 110 S.Ct. 2143).
The majority concludes that the holdings of James and Johnson have not implicitly overruled our holding in Higgs. Ante at 319-20. I cannot agree. Our holding in Higgs was that the (c)(2) aggravator contains the word “involving,” which precludes application of the categorical approach. 353 F.3d at 316-17. This sole premise has been wholly undermined by the Supreme Court’s use of the categorical approach in James for a statute that similarly used the word “involves.” After James and the emphasis of the word “conviction” in Johnson, it cannot be said that the word “involving” — on its own — signifies that the categorical approach is inappropriate.
As the majority points out, some statutes using the word “involving” are analyzed under the categorical approach, and some statutes using the word “involving” are not. See ante at 319-20.[4] But this is itself evidence that Higgs is no longer good law with respect to this contested holding. Under the logic of Higgs, this disparity would be impossible; Higgs dictates that no statute using the word “involving” could be subject to the categorical approach. Notably, in reaching this conclusion I am not claiming that the implied overruling of Higgs by James dictates that the categorical approach must be applied — the overruling only means that we must consider the issue anew.
The majority cites to the Eighth Circuit’s decision in United States v. Rodriguez, 581 F.3d 775, 806 (8th Cir. 2009), in support of its conclusion that Higgs has not been overruled. To the contrary, Rodriguez only serves to undermine the idea that Higgs has not been implicitly overruled in this respect. In Rodriguez, the court noted, “the meaning of ‘involving’ does not resolve the issue.” 581 F.3d at 806. Then, the court in Rodriguez went on to determine that the categorical approach did not apply based on the structure and language of the statute, but did not base that conclusion solely on the word “involving.” Id. at 806-07. This is in stark contrast to our analysis in Higgs, which, as explained above, was based on the word “involving” alone. Rodriguez demonstrates that the word “involving” is not the end of inquiry when it comes to the categorical approach; this is fully consistent with my understanding of James. Again, I do not claim that James signifies that the word “involving” dictates the use of the categorical approach. I simply believe James signifies that the word “involving” cannot by itself dictate anything — examination of other factors will always be necessary.
Further, at least one district court has expressly called into question our holding in Higgs, declining to rely on it due to the Supreme Court’s holding in James. See United States v. Basciano, 763 F.Supp.2d 303, 347 (E.D.N.Y. 2011), aff'd on other issues, 634 Fed.Appx. 832 (2d Cir. 2015). Another district court has expressly disa *327 greed with our logic in Higgs for the reasons later espoused by the Court in James. See United States v. Sablan, 555 F.Supp.2d 1177, 1191 (D. Colo. 2006) (rejecting the word “involved” as a basis for distinguishing the FDPA from the ACCA, and noting “[t]his [was] the distinction that Higgs relied on”).
At bottom, Higgs relied exclusively on the fact that the previous conviction for a firearm offense aggravator at (c)(2) includes offenses that “involv[e] the use or attempted or threatened use of a firearm ... against another person.” The Supreme Court in James and Johnson has disavowed the idea that the word “involve” alone can render a sentencing enhancement provision immune from the categorical approach. Accordingly, I would find that James and Johnson have implicitly overruled our conclusion in Higgs that the categorical approach does not apply to (c)(2), and start my analysis on this issue from a blank slate.
B.
Turning now to whether the categorical approach applies to previous convictions for the aggravators in 18 U.S.C. § 3592(c)(2) and (c)(4), I would find that it does. The majority rightly points out that authority on this issue is scant. See ante at 313-15. The only circuits to weigh in thus far have been this Court and the Eighth Circuit, and then a smattering of district courts. The majority of courts to opine on this issue have concluded that the categorical approach would not apply; however, the majority is not always right.
1.
To provide context for why I do not agree with the view of the majority opinion here, I briefly review the Supreme Court’s death penalty jurisprudence. The Court has broken down the penalty phase of capital sentencing into two different phases — eligibility and selection. Tuilaepa v. California, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); see also Jones v. United States, 527 U.S. 373, 376-79, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (explaining procedures under the FDPA and discussing how the jury must unanimously find eligibility before it can proceed to the selection decision). At the eligibility phase, “the trier of fact must convict the defendant of murder and find one ‘aggravating circumstance’ (or its equivalent).” Tuilaepa, 512 U.S. at 972, 114 S.Ct. 2630. Then, the Court has “imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.” Id. (emphasis added). “What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.” Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (first emphasis added, second emphasis in original). As noted by the Court, “[t]he objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time.” Tuilaepa, 512 U.S. at 973, 114 S.Ct. 2630.
2.
In reaching its conclusion, the majority relies on opinions from courts that reject the categorical approach by relying on the Supreme Court’s requirement that death penalty sentencing be individualized. See ante at 314-15; Rodriguez, 581 F.3d at 806-07 (“[T]he FDPA mandates a fact-intensive process in death-eligible proceedings. ,.. Beyond the FDPA, the factual inquiry required in death penalty cases has constitutional significance.”); United States v. Con-ui, No. 13-cr-123, 2017 WL 783437, *328 at *11-12. (M.D, Pa. Mar. 1, 2017) (relying on Zant and the cases cited here to explain that the individualized sentencing requirement in capital punishment precludes application of the categorical approach); Basciano, 763 F.Supp.2d at 348 (adopting Rodriguez in whole on this issue); United States v. Anh The Duong, No. CR-01-20154, 2010 WL 275058, at *3 (N.D. Cal. Jan. 14, 2010) (same); United States v. Chong, 98 F.Supp.2d 1110, 1120 (D. Haw. 1999) (“Defendant’s, argument that the statute provides that the jury is only to consider the fact of conviction, rather than the conduct underlying the conviction, , flies in the face of the Supreme Court’s mandate to particularize capital sentencing proceedings.”). Each of these cases cites to Zant or its progeny in support of this idea, but as is clear from the language of Zant itself, the individualized determination is necessary at the selection phase — not the eligibility, phase.
The only court to appreciate and give meaning to this distinction is the opinion of the district court in United States v. Smith, 630 F.Supp.2d 713 (E.D. La. 2007). As the court there recognized, “the issue of individualized sentencing is simply not at play in the eligibility phase of capital sentencing.” Smith, 630 F.Supp.2d at 718. The court explained, “It is at the selection phase that the individualization of the sentencing occurs, likewise the weighing of the aggravating and mitigating circumstances to determine whether a death sentence should in fact be imposed.” Id. at 717. In contrast, the purpose of the eligibility phase “is to narrow the pool of offenders eligible for death.” Id. And, as emphasized by Justice Blackmun in a powerful dissent, the point of the individualized approach in capital sentencing is to “afford[ ] the sentencer the power and discretion to grant mercy in a particular case, and provid[e] avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death.” Callins v. Collins, 510 U.S. 1141, 1144, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting), This point was further underscored in Kansas v. Marsh, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), where the Court explained that:
[A]- state capital sentencing system must: (1) rationally narrow the class .of death-eligible defendants; and (2) permit a jury to .render a reasoned, individualized sentencing determination based on .a death-eligible defendant’s record, personal .characteristics, and the circumstances of his crime.
Marsh, 548 U.S. at 173-74, 126 S.Ct. 2516 (citing Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Thus, the clear purpose of individualized sentencing is for the selection stage once the defendant has -become a “death-eligible defendant." To flip the individualized sentencing requirement on its head and use it as a means to find a defendant death eligible perverts the requirement and renders it unrecognizable.
The majority resists this conclusion, and instead finds that that the legal distinction between eligibility and selection “is neither present in, nor contemplated by, the FDPA.” Ante at 318, I cannot agree. Although hot expressly laid out, the FDPA first requires a unanimous finding by-the jury of at least one statutory aggravator in order to consider whether the defendant may be sentenced to death. See 18 U.S.C. § 3593(d)-(e), Further, it is only once the defendant has been found death eligible pursuant to one of the statutory aggrava-tors listed in 18 U.S.C. § 3592 that the jury may proceed to consider any non-statutory- aggravators and any mitigation evidence proffered by the defendant. See Jones, 527 U.S. at 377-78 & n.2, 119 S.Ct. *329 2090; see also 18 U.S.C. § 3593(d)-(e). No one can dispute that mitigation evidence and non-statutory aggravator evidence cannot be considered by the jury in its eligibility phase decision; even the government itself has conceded below that different constitutional protections attach at eligibility and selection. J.A. 122-23 (“The clear implication of the holding [in Ring] was that eligibility and selection were distinct components of the process, with the former being subject to, among other things, various constitutional requirements.” (emphasis added)).
Thus, I cannot agree with the majority’s conclusion that the FDPA does not provide for a difference between eligibility and selection. Rather, I believe that- those are two different issues, involving distinct burdens and types of evidence available for consideration, and the jury must be instructed accordingly on what it may consider and how to reach each conclusion.[5]
3.
Having concluded that there is a meaningful difference between the eligibility and selection phases that must be factored into this decision, I now move on to the question of whether we should apply the categorical approach to the (c)(2) and (c)(4) statutory aggravates. I conclude that we should.
As the majority discusses, the ACCA is the original source of the categorical approach. See ante at 315-16. But the categorical approach is not limited to the ACCA. It applies in the context .of immigration cases, see, e.g., Gonzalez v. Duenas-Alvarez, 549 U.S. 183, 186, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007), to determining crimes of violence under the Sentencing Guidelines, see, e.g., United States v. Montes-Flores, 736 F.3d 357, 364 (4th Cir. 2013), and to determining crimes of violence under 18 U.S.C. § 16 and the myriad statutes that incorporate that definition, see, e.g., Karimi v. Holder, 715 F.3d 561, 567 (4th Cir. 2013).
Determining whether the categorical approach should be applied is a matter of statutory interpretation. In interpreting the statute, we examine the text to determine whether Congress intended to “re-ferí] to a generic crime, or .. :■ to the specific way in which an offender committed the crime on a specific occasion.”' Nijhawan v. Holder, 557 U.S. 29, 34, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009).
The Supreme Court has often explained the rationales for applying the categorical approach to the ACCA, doing so most recently in Mathis v. United States, _ U.S. _, 136 S.Ct. 2243, 2252-53, 195 L.Ed.2d 604 (2016): (1) the text favors that approach by referring to “a defendant who has three ‘previous convictions’ .., rather than one who has ... committed that crime;” (2) Sixth Amendment concerns in permitting a judge at sentencing to find facts beyond the fact of conviction; and (3) perceived unfairness to defendants posed by a contrary approach. Id. These rationales- guide the following analysis of the statutory language at issue in this case.
a.
I turn first to the text. When a statutory scheme “asks what offense the [defendant] was ‘convicted’ of,” our focus must move to an elements-based approach, as “ ‘[Conviction’ is. ‘the relevant statutory hook.’ ” Moncrieffe v. Holder, 569 U.S. 184, 133 *330 S.Ct. 1678, 1685, 185 L.Ed.2d 727 (2013) (quoting Carachuri-Rosendo v. Holder, 560 U.S. 563, 130 S.Ct. 2577, 2588, 177 L.Ed.2d 68 (2010)) (first modification added, second in original). Applying this standard here, it is clear that the categorical approach should be applied. In 18 U.S.C. § 3592(c)(2) and (c)(4), the focus of the statute is on “conviction” and on what offense the defendant has been convicted of, rather than on what specifically the defendant did.
By eliding the difference between eligibility and selection, the majority reads the FDPA to require a fact-intensive inquiry. See ante at 316 (citing United States v. Caro, 597 F.3d 608, 626 (4th Cir. 2010), in turn quoting Zant, 462 U.S. at 879, 103 S.Ct. 2733). As explained above, however, this is not so at the eligibility phase. The majority then reiterates the holding of Higgs that the word “involves” in (c)(2) and (c)(4) necessitates a circumstance specific analysis. See ante at 316-17. Again, for the reasons explained above, James and Johnson have squarely rejected this conclusion.
The text of the FPDA clearly focuses on a person’s having been convicted, and not on the committed conduct. A comparison of the statutory language in the FDPA and that in the ACCA and the INA — where we do apply the categorical approach — is illuminating:
• “[T]he defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.” 18 U.S.C. § 3592(c)(2) (emphasis added) (FDPA).
• “The defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.” Id. § 3592(c)(4) (emphasis added) (FDPA).
• “In the case of a person who violates section 922(g) of this title and has three previous convictions by any court ... for a violent felony or a serious drug offense, or both ... such person shall be fined under this title and imprisoned not less than fifteen years.... ” Id. § 924(e)(1) (emphasis added) (ACCA).
• “Any alien who is convicted of an aggravated felony at any time after admission is deportable.” 8 U.S.C. § 1227(a)(2)(A)(iii) (emphasis added) (INA).
There can be no meaningful textual difference between “has previously been convicted” as is found in the FDPA, “has ... previous convictions,” as is found in the ACCA, and “is convicted” as found in the INA. The majority focuses on drawing out distinctions between the FDPA and the ACCA, but never addresses the stark textual similarity that exists between the FDPA and the INA.
Further illustrating the importance of this textual analysis are the Court’s holdings in Nijhawan v. Holder, 557 U.S. 29, 129 (S.Ct. 2294, 174 L.Ed.2d 22 2009) and Kawashima v. Holder, 565 U.S. 478, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012), two different cases interpreting a provision of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101, et seq. The INA provides that “Any alien who is convicted of an aggravated felony at any time after admission is deportable.” 8 U.S.C. § 1227(a)(2)(A)(iii). The INA then goes on to define “aggravated felony” in a number of ways, one of which is “an offense that *331 [1] involves fraud or deceit [2] in which the loss to the victim or victims exceeds $10,000.” Id. § 1101(a)(43)(M)(i). Interestingly, the Court has interpreted the two different clauses in this same statutory provision to require different approaches— one categorical, and one circumstance-specific.
In Nijhawan, the Court had considered the second part of that definition — the “loss” clause. The Court concluded that the “loss” clause required circumstance-specific analysis, and thus did not require application of the categorical approach. 557 U.S. at 32, 129 S.Ct. 2294. The Court reasoned that the definition of “aggravated felon/’ in the INA contained two types of definitions for the term: (1) generic crime definitions; and (2) specific circumstances definitions. Id. at 37-38, 129 S.Ct. 2294. In concluding that the “loss” phrase was a specific circumstances definition, the Court held that the “loss” phrase “refer[s] to the conduct involved ‘in’ the commission of the offense of conviction, rather than to the elements of the offense.” Id. at 39, 129 S.Ct. 2294.
Later, in Kawashima, the Court considered the first part of the definition — the “fraud or deceit” clause. When considering that part of the definition, the Court “employed] a categorical approach by looking to the statute defining the crime of conviction, rather than to the specific facts underlying the crime.” 565 U.S. at 483, 132 S.Ct. 1166. Thus, even where the Court had already considered part of the statutory provision to be circumstance-specific, the Court still in a later case applied the categorical approach to another part of the same provision based on the textual differences between the two clauses. The aggra-vators in (c)(2) and (c)(4) much more closely resemble the “fraud or deceit” clause to which the categorical approach is applied, and not the “loss” clause under which there is a circumstance-specific analysis. To the extent the government and the majority argue that because the categorical approach does not apply to some ag-gravators means it cannot apply to any aggravators, this pair of cases soundly rejects such a position.
Additionally, the majority focuses on the specifics of the sentencing hearing in order to conclude that the text of the FDPA does not support applying the categorical approach. Ante at 316-17. The majority concludes that because aggravating and mitigating evidence may be presented during the sentencing hearing, this indicates that the categorical approach cannot be applied. Id. This emphasis is misplaced not only for the reasons explained above regarding eligibility versus selection, but also because it ignores what actually happens in an ACCA case.
In an ACCA case, once the court applies the categorical approach to determine whether the mandatory minimum sentencing enhancement applies, that does not conclude the sentencing process. The court must still go through the Guidelines, determine whether there should be changes to the offense level, and determine an appropriate sentence guided by the sentencing factors in 18 U.S.C. § 3553(a). Nothing prohibits a sentencing court from considering the specifics of previous offenses in determining, for example, whether a lengthier sentence is needed to ensure deterrence. Indeed, 18 U.S.C. § 3553(a) specifically instructs the sentencing court to consider “the nature and circumstances of the offense and the history and characteristics of the defendant.” 18 U.S.C. § 3553(a)(1) (emphasis added). I can see no meaningful distinction between those instructions to a sentencing court in a non-capital case, and the instruction that at a sentencing hearing for a capital defendant “information may be presented as to any *332 matter relevant to the sentence, including any mitigating or aggravating factor.” 18 U.S.C. § 3593(c) (cited by the majority, ante at 314); And yet, the majority concludes that the former permits the categorical approach, while the latter prohibits it.
Finally, in rejecting the textual argument, the majority fears that employing the categorical approach would be unwieldy, because the meaning of the (c)(2) and (c)(4) aggravators “would carry different meanings throughout the penalty phase.” Ante at 317. This is an overstated fear, and internally inconsistent with our approach to the FDPA sentencing process. Other statutory language from FDPA has different meanings in the eligibility and selection phases, and this has not proved problematic. For instance, the plain text of the FDPA requires only that the jury “identify! ] any aggravator factor or factors set forth in section 3592 found to exist” to sentence a . defendant to death Id. § 3593(d). However, this scheme has been interpreted to require that for the purposes of eligibility, that provision from § 3593(d) must mean a specifically enumerated factor under § 3592, but for the purposes of selection, it means the additional non-statutory aggravators. See Jones, 527 U.S. at 377-78 & n.2, 119 S.Ct. 2090. This language “carrying] different meanings throughout the penalty phase,” ante at 317, has not proved problematic, and thus this concern should not drive our reasoning here.
In sum, I find the text supports and mandates that we apply the categorical approach to the (c)(2) and (c)(4) aggrava-tors.
b.
Turning next to concerns between judge and jury, I recognize that the same Sixth Amendment concerns that exist in the ACCA context, are not present in the FDPA context, as the statute requires the sentencing decisions to be rendered either by the jury or the court upon the defendant’s motion and the government’s approval. See 18 U.S.C. § 3593(b). However, the role of the jury is still a relevant factor to be considered. The majority concludes that applying the categorical approach would “completely usurpt ]” the jury’s statutory role in capital sentencing. Ante at 318. This is incorrect.
Applying the categorical approach would be entirely consistent .with the role of the jury in the FDPA. The judge would first determine whether the prior convictions categorically qualify under (c)(2) and (c)(4). Then, the jury would determine at eligibility whether the government has sufficiently proved that the prior convictions exist.[6] Assuming the case moves on to selection, the jury would then hear all relevant evidence about prior convictions for its selection decision, and appropriately return *333 findings about aggravating factors, mitigating factors, and a sentence recommendation. This envisioned scheme does not detract from the jury’s prescribed function of “considering] each ... aggravating factor[ ] for which notice has been given and determin[ing] which, if any, exist.” 18 U.S.C. § 3592(c).
Further, in expressing its concerns regarding the role of the jury, the majority ignores the way in which we already use this scheme under the ACCA for offenses committed under 18 U.S.C. § 924(c)(1)(A), which proscribes using or carrying a firearm during and in relation to a crime of violence as defined by 18 U.S.C. § 16. In those crimes, the court first determines— under the categorical approach — whether the alleged underlying offense qualifies as a crime of violence. The jury then determines — using all available, facts — (1) whether a crime of violence was committed; and if so, (2) whether a firearm was used during that crime. See United States v. Hopkins, 310 F.3d 145, 152-53 (4th Cir. 2002). Thus, the role of the jury under my interpretation for the eligibility stage of the (c)(2) and (c)(4) aggravators is similar to how we consistently use the jury in the determination of guilt or innocence under the ACCA.
Therefore, while recognizing a lessened Sixth Amendment concern on this issue, I conclude that the jury would retain a meaningful role in the assessment of eligibility factors under the categorical approach.
c.
Finally, the issue of perceived unfairness weighs in favor of applying the categorical approach. The majority concludes that because the FDPA does not require bifurcated sentencing proceedings, there can be no perceived unfairness to the defendant. Ante at 318. The majority further concludes that the categorical approach would fail to genuinely narrow the class of death eligible defendants. Ante at 318 — 19. I disagree on both points.[7]
In responding to both conclusions from the majority I am again guided by the significant difference that must exist in the eligibility and selection phase of sentencing. Even if conducted in one unified hearing, there are still different standards guiding the jury regarding what evidence may be considered at each phase, a point I make in great detail in Sections II.B.2 and II.B.3.a, sitpra, and need not repeat here.
The second conclusion additionally twists death penalty jurisprudence completely. It is quite bizarre to find that applying the categorical approach to these aggravators somehow runs afoul of the Eight Amendment requirement that statutory aggravators “genuinely narrow the class of persons eligible for the death penalty.” Zant, 462 U.S. at 877, 103 S.Ct. 2733. Applying the categorical approach will necessarily decrease the number of death eligible defendants, under these aggravators, not increase the number. This concern is especially strange in light of our shared conclusion that permitting post-offense convictions to qualify as previous convictions “expands the class of offenders with previous convictions ... [and] nonetheless narrows the class of all murderers to only murderers with previous convictions.” Ante at 311. Applying, the categorical approach further does not narrow the class of defendant in -an arbitrary manner such that this interpretation would otherwise *334 run afoul of the Eighth Amendment. Cf. Godfrey v. Georgia, 446 U.S. 420, 427, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (“[T]he penalty of death may not be imposed under sentencing procedures that create a substantial risk of that the punishment will be inflicted in an arbitrary and capricious manner.”).
Moreover, the majority also argues that the categorical approach would prevent a jury from giving a sentence of death to “the most culpable defendants committing the most serious offenses,” Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2467, 183 L.Ed.2d 407 (2012). Notably, this fear that defendants would be excluded is at odds with the majority’s concern that the class of eligible persons is not genuinely narrowed. And nothing about this approach would violate the requirement that the class of death-eligible defendants be narrowed in a genuine manner, as the categorical approach is, in fact, “objective, evenhanded, and substantively rational.” See Caro, 597 F.3d at 623 (quoting Zant, 462 U.S. at 879, 103 S.Ct. 2733) (cited by majority, ante at 319).
Additionally, this concern is completely unfounded. Congress has made clear who the “most culpable” defendants are — those who satisfy the statutory aggravators. It is not for us to make a moral judgment about who should and should not be considered the “most culpable;” it is for us to interpret the statutory aggravator as written by Congress and determine whether a defendant actually falls within that aggravator. Further, so long as the defendant’s prior convictions qualify, nothing about applying the categorical approach at the eligibility phase would prevent information about the specifics of the prior convictions from being introduced at the selection phase. Additionally, if there are other ag-gravators that make the defendant death eligible, the categorical approach to the prior convictions statutory aggravator does not matter for the purposes of eligibility, and the information could be presented to the jury as a non-statutory aggravator during selection.
The real issue in determining unfairness to the defendant is the inequity that would occur if non-elemental facts were used to render the defendant death eligible. Using such facts is inherently unfair, for “Statements of ‘non-elemental fact’ in the records of prior convictions are prone to error precisely because their proof is unnecessary.” Mathis, 136 S.Ct. at 2253. The reasoning for why this would be unfair to defendants in the ACCA context rings true in the FDPA context:
At trial, and still more at plea hearings, a defendant may have no incentive to contest what does not matter under the law; to the contrary, he “may have good reason not to” — or even be precluded from doing so by the court. When that is true, a prosecutor’s or judge’s mistake as to means, reflected in the record, is likely to go uncorrected. Such inaccura<-cies should not come back to haunt the defendant many years down the road by triggering a lengthy mandatory sentence.
Id. (citations and footnote omitted). But in the FDPA context, this does not trigger a lengthy mandatory sentence; instead, it triggers a defendant’s actual life and right to continued existence being put in jeopardy. There can be no greater unfairness.
Therefore, I find that perceived unfairness to the defendant also weighs in favor of applying the categorical approach.
C.
Finally, I would assess the convictions used by the government to determine whether they satisfy the (c)(2) and (c)(4) aggravators. In order for Torrez’s death *335 sentence to be vacated, the convictions must fail to satisfy both of the aggrava-tors. I would conclude that they do.
1.
Torrez’s prior convictions under Virginia law cannot make him death eligible under (c)(2). To qualify as a prior conviction under (c)(2), the prior conviction must involve “a firearm (as defined in section 921 [of Title 18]).” 18 U.S.C. § 3592(c)(2). Instructive on this issue is Mellouli v. Lynch, _ U.S. _, 135 S.Ct. 1980, 192 L.Ed.2d 60 (2015), an immigration case applying the categorical offense to a prior state drug conviction. There, the alien had pleaded guilty to a misdemeanor drug offense in Kansas; however, neither the criminal charge nor the plea agreement identified which drugs qualified as controlled substances, and the statute broadly covered multiple controlled substances. Id. at 1983. Immigration officials then sought to remove the alien under a provision of the INA that “authorizes the removal of an alien ‘convicted of a violation of ... any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21).’ ” Id. at 1984 (quoting 8 U.S.C. § 1227(a)(2)(B)(i)) (omission in original). The Kansas state crime did not define a controlled substance with respect to the federal definition contained in 21 U.S.C. § 802; indeed, “it was immaterial under that [state] law whether the substance was defined in 21 U.S.C. § 802,” and the state prosecutors did not “charge, [n]or seek to prove, that [the alien] possessed a substance on the § 802 schedules.” Id. Accordingly, the Court found that federal immigration law did not authorize removal, because under the categorical approach, the government could not “connect an element of the alien’s conviction to a drug ‘defined in [§ 802].’ ” Id. at 1991 (addition in original).
Torrez’s conviction and the (c)(2) aggra-vator present the same problem. The (c)(2) aggravator specifically links the definition of a firearm to 18 U.S.C. § 921. Therefore, we must look to the definitions in 18 U.S.C. § 921 of a firearm, and compare that definition with the conduct criminalized by the Virginia statutes. Section 921 exempts antique firearms from the definition of “firearm,” id. § 921(a)(3); exempts certain shotguns, ⅛§ 921(a)(4)(B); and requires that the weapon actually be capable of expelling a projectile or being readily converted to do so, id. § 921(a)(3)(A). Section 921 also expressly includes “any destructive device” within the definition of “firearm.” Id. § 921(a)(3)(D).
The statute under which Torrez has four convictions, Va. Code § 18.2-53.1, prohibits the use, attempted use, or display of “any pistol, shotgun, rifle, or other firearm” in connection with certain felonies. As the Supreme Court of Virginia has held, this statute criminalizes not only “the use or display of an actual firearm that has the capability of expelling a projectile by explosion,” but also “an instrumentality that has the appearance of having the capability of an actual firearm.” Startin v. Commonwealth, 281 Va. 374, 706 S.E.2d 873, 877 (2011) (citing Holloman v. Commonwealth, 221 Va. 196, 269 S.E.2d 356, 358 (1980)). Thus, Virginia gives “a broad construction” to the term “firearm” in Va. Code. § 18.2-53.1. Id. at 878 (internal quotation marks omitted).
Torrez also has one conviction for common law burglary under Va. Code § 18.2-89, which has a grading enhancement if the defendant “was armed with a deadly weapon at the time.” Although no case from the Supreme Court of Virginia has defined “deadly weapon” for the purposes of this burglary statute, there have been lower court opinions defining the term *336 “deadly weapon” for the- purposes of another statute which criminalized bank burglary. See Justiss v. Commonwealth, 61 Va.App. 261, 734 S.E.2d 699, 707 (2012) (“A deadly weapon is any object or instrument, not part of the human body, that is likely to cause death or great bodily injury because of the manner and under the circumstances in which it was used.” (internal quotation marks and alterations omitted) (citing Cox v. Commonwealth, 218 Va. 689, 240 S.E.2d 624, 526 (1978))); see also Va. Prac. Jury Instructions § 80:23 (same). Thus, a knife could be used as “a deadly weapon”, to satisfy the grading enhancement in Virginia.
Because Virginia criminalizes even the use of toy guns that look like real ones unjler Va. Code § 18.2-63.1 and the use of any deadly weapon during a burglary under Va. Code § 18.2-89, neither crime requires the use of “a firearm (as defined in section 921).” Additionally, the record discloses no evidence that the Virginia prosecutors sought to prove that the weapons used by Torrez in the commission of those offenses satisfied the federal definition of “a firearm (as defined in section 921).”
Accordingly, Torrez has no convictions that satisfy the (c)(2) aggravator.
2.
In order for thé (c)(4) aggravator to be met, the prior offenses must (1) be committed on at least two separate occasions, and (2) “involvfe] the infliction of, or attempted infliction of, serious bodily injury or death upon another person.” 18 U.S.C. § 3692(c)(4). The two relevant dates here are February 10, 2010, and February 27, 2010 — the two dates on which the Arlington Offenses were committed. Torrez does not challenge whether the February 27, 2010 offenses satisfy (c)(4), but he does challenge the February 10, 2010, offenses.[8] If the February 10, 2010, offenses do not categorically “involvfe] the infliction of, or attempted infliction of, serious bodily injury or death upon another person,” then the (c)(4) aggravator cannot be met.
Torrez was convicted of committing robbery in violation of Va. Code § 18.2-58 and abduction with nefarious intent in violation of Va. Code § 18.2-48 on February 10, 2010, in connection with his attack on M.N. I would find that neither offense can satisfy (c)(4).
The requirement in (c)(4) of “seriously bodily injury or death” is similar to what we know as the “force clause” contained in the definition of “violent felony” under the ACCA and the definition of “crime of violence” under the career offender sentencing guideline,[9] as well as in other areas of Title 18 and the sentencing guidelines. Therefore, cases interpreting that clause throughout the relevant legal landscape are relevant here. Importantly, the (c)(4) requirement is higher than the force clause in the ACCA -and the Guidelines. Whereas the ACCA and the Guidelines require only “physical force” and permit such force to be “threatened,” see 18 U.S.C. § 924(e)(2)(B)©; U.S.S.G. § 4B1.2(a)(l), the (c)(4) aggravator requires actual or *337 attempted infliction of “serious bodily injury or death,” 18 U. S.C. § 3592(c)(4). Thus, if a crime categorically fails under either the force clause of the ACCA or the Guidelines, it must a fortiori fail the (c)(4) requirement.
a.
First, we look at Torrez’s conviction for common law robbery. Recently, in United States v. Winston, 850 F.3d 677 (4th Cir. 2017), we considered whether common law robbery in violation of Va. Code § 18.2-58 was a violent felony under the ACCA. We held that “the minimum conduct necessary to sustain a conviction for Virginia common law robbery does not necessarily include the use, attempted use, or threatened use of ‘violent force ... capable of causing physical pain or injury to another person.’ ” 850 F.3d at 685 (quoting Johnson v. United States, 559 U.S. 133, 140, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010)) (omission in original). Accordingly, we found that robbery in violation of Va. Code § 18.2-58 could not satisfy the force clause of the ACCA and could not be a prior conviction for the purposes of the ACCA sentencing enhancement. As such, Torrez’s robbery conviction also cannot qualify under the (c)(4) aggravator.
b.
Because Torrez’s robbery conviction fails to satisfy the (c)(4) aggravator, the abduction offense must do so in order for the death sentence to be upheld. It does not. Torrez was conviction of abduction with nefarious intent in violation of Va. Code § 18.2-48. This offense raises the issue of divisibility under the categorical approach, because it lays out five different options for violating the statute.
If a statute “set[s] out elements in the alternative and thus create[s] multiple versions of the crime,” we consider the statute divisible and apply what we call the modified categorical approach. United States v, Montes-Flores, 736 F.3d 357, 365 (4th Cir. 2013) (internal quotation marks omitted). “[A] crime is divisible [for the purposes of the categorical approach] only if it is defined to include multiple alternative elements (thus creating multiple versions of a crime), as opposed to multiple alternative means (of committing the same crime).” Omargharib v. Holder, 775 F.3d 192, 198 (4th Cir. 2014) (citations omitted). In the instance of a divisible crime, we “look[ ] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of.” Mathis, 136 S.Ct. at 2249.
I need not decide whether the offense set out in Va. Code § 18.2-48 is divisible; I can assume it is for the purposes of this analysis. Assuming divisibility and looking to the jury’s actual verdict form, Torrez was convicted of “abduction .,. with the intent to defile and/or the intent to extort money or gain pecuniary benefit” in violation of Va. Code § 18.2-48. J.N. 257. Thus, it is entirely unclear from the verdict form if the intent agreed upon by the jury was “intent to defile” or “intent to extort money or gain pecuniary benefit” with respect to his abduction of M.N. Assuming the least culpable criminal conduct under the categorical approach, the jury could have found Torrez guilty of abduction with intent to extort money. Extortion requires no force, let alone the actual or threatened infliction of serious bodily injury or death. As a result, the abduction offense does not qualify under the (c)(4) aggravator. Therefore, no February 10, 2010, offense qualifies, and thus (c)(4) cannot be satisfied because the only qualifying crimes were all committed on February 27, 2010.
*338 III.
Because I find that our holding in Higgs with respect to the categorical approach has been implicitly overruled by the Supreme Court, I would consider the issue anew and find that the categorical approach should apply to the aggravators found at 18 U.S.C. § 3592(c)(2) & (c)(4). Then, applying the categorical approach, I would find that the prior convictions asserted by the government do not satisfy either of those statutory aggravators. Accordingly, I would vacate the sentence of death in this case, strike the (c)(2) and (c)(4) aggravators from the government’s notice of intent to seek the death penalty, and remand for resentencing.
The death penalty is a complicated area of our law, especially when dealing with what makes a defendant eligible for capital punishment. I do not question the wisdom of Congress in passing the FDPA, nor do I question the wisdom of this nation’s vaunted prosecutors from using all available tools in their zealous prosecution of crime. But capital punishment must be effected fairly, consistently, without prejudice, and with the opportunity for mercy. Although the categorical approach may render certain defendants who would otherwise be death eligible no longer able to be considered for capital punishment, applying this understanding hews to the language of the statute as drafted by Congress.
For these reasons, I respectfully dissent from the majority’s holding with respect to Torrez’s sentence.

. 18 U.S.C. § 3592(c)(3), (c)(10), and (c)(12) are also concerned with previous convictions. Statutory aggravators related to prior convictions also exist for capital defendants accused of crimes other than homicide. See 18 U.S.C. § 3592(b)(1) &(d)(l)-(3).

. In joining the majority's conclusion in Part IV.A, I- note that the holding from Higgs on this issue appears contrary to our conclusions in other contexts. See, e.g., United States v. Pressley, 359 F.3d 347, 351 (4th Cir. 2004) (“Unlike the sentencing date, the violation date is not subject to the whims of the court’s docket nor vulnerable to manipulation by either party. Rather, it would be ‘absurd’ to adopt an interpretation, not- supported by the plain text of the statute, which would subject a defendant to a mandatory fifteen-year minimum sentence based oh the mere fortuity of his sentencing date.”). However, I also acknowledge that to the extent Pressley and Higgs are viewed to be in conflict on this holding, Higgs would control under the earliest-case-governs rule. See McMellon v. United States, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) (“When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled -by an intervening opinion from this court sitting en banc or the Supreme Court.").

. James was later overruled on other grounds by Johnson v. United States, _ U.S. _, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015).

. The majority reasons that Congress used the word "involved” in other aggravators that are clearly not susceptible to the categorical approach. Ante at 319-20. This point, while correct, is inapposite, Both of the aggravators that do so — § 3592(c)(6) & (c)(13) — are focused on characteristics of the offense of conviction and not characteristics of the defendant as in (c)(2) and (c)(4). It would be nonsensical for the categorical approach to apply to characteristics of the offense of conviction, but applying the categorical approach to characteristics of the defendant is exactly what we do in the ACCA context and what we should do here as I explain further in Section II.B, infra.

. Because of the differences between the eligibility and selection phases, separate proceedings — as took place here — are, if not required, at least recommended, See Tuilaepa, 512 U.S. at 973, 114 S.Ct. 2630 (noting that conducting eligibility and selection phases jointly can result in "some tension”).

. To the extent this is open to criticism that this would be a perfunctory role for the jury to perform, I note that we require it of the jury in the context of an 18 U.S.C. § 922(g)(1) felon in possession case. The jury must find that the defendant was actually a felon prohibited from possessing a firearm as an element of the offense. See. United States v. Langley, 62 F.3d 602, 604 (4th Cir. 1995) (en banc) (laying out the elements of the § 922(g)(1) offense, the first of which is the defendant "had been convicted in some court of a crime punishable by a term of. imprisonment exceeding one year”). Although often'stipulated to by the defendant for strategic reasons, the jury still must, find that element. See United States v. Muse, 83 F.3d 672, 679 (4th Cir. 1996) ("[O]nce a defendant pleads not guilty to a crime and elects to proceed before a jury, the district court must instruct, and the jury must consider, whether the government has proved beyond a reasonable doubt all the elements involved in the crime charged — even if the defendant and the government have entered a stipulation as to certain of those elements,”).

. Having found that Higgs's holding was implicitly overruled, I do not reach the issue of drawing a distinction between- the unitary sentencing proceeding that occurred in Higgs and the bifurcated sentencing proceeding that occurred below. Thus, I do not respond to the majority’s arguments on this point.

. Torrez does not concede that the February 27, 2010 offenses qualify, see Appellant's Br. at 73, but as the government rightly responds, failure to- present an argument as to those offenses in the opening brief constitutes waiver, see Appellee’s Br, at 84-85.

. See 18 U.S.C, § 924(e)(2)(B)(i) ("[T]he term 'violent felony’ means any crime ,,. that has as an element the use, attempted use, or threatened use of physical force against the person of another..,.”) (emphasis added); U.S.S.G. § 4B 1.2(a)(1) ("The term ‘crime of violence’ means any- offense ,.. that has as an element the use, attempted use, or threatened use of physical force against the person of another.,..”) (emphasis added).'